### BERGH et al. v. HERRING–HALL–MARVIN SAFE CO.

(Circuit Court of Appeals, Second Circuit. February 27, 1905.)

### No. 40.

1. LANDLORD AND TENANT—PERSONAL PROPERTY—REMOVAL—TRADE FIXTURES.
   Where certain rented property was used as a factory, boilers, engines, shafting, hangers, pulleys, etc., placed on the premises by the tenant for use in its business, and removable without material injury to the building, were trade fixtures, which the tenant was entitled to remove on termination of the lease.

   [Ed. Note.—For cases in point, see vol. 23, Cent. Dig. Fixtures, §§ 23–29.]

2. SAME—EJECTMENT—VOLUNTARY SURRENDER.
   Where tenants were summarily ejected, their retirement without immediate removal of trade fixtures could not be regarded as a voluntary surrender thereof to the lessor.

   [Ed. Note.—For cases in point, see vol. 23, Cent. Dig. Fixtures, §§ 63–65.]

3. SAME—TIME FOR REMOVAL.
   A dispossessed tenant is entitled to a reasonable time within which to remove trade fixtures.

   [Ed. Note.—For cases in point, see vol. 23, Cent. Dig. Fixtures, §§ 63–65.]

4. SAME—CONVERSION BY LANDLORD.
   Where receivers appointed for an insolvent corporation were dispossessed from rented premises occupied by them, and thereafter demanded posses-

sion of trade fixtures left on the premises of the lessor, which he refused, such refusal amounted to a conversion of the property.

5. SAME—ACCEPTANCE OF NEW LEASE.

The acceptance of a new lease by a tenant, without reservation of the right to remove trade fixtures previously placed on the premises, does not operate as an abandonment of the tenant's right to remove such fixtures on being subsequently ejected from the premises.

In Error to the Circuit Court of the United States for the Southern District of New York.

John L. Cadwalader and William Greenough, for plaintiff in error.
John A. Garver, for defendant in error.

Before WALLACE, TOWNSEND, and COXE, Circuit Judges.

COXE, Circuit Judge. Prior to December 23, 1897, the Herring-Hall-Marvin Company was engaged in the business of making safes upon premises owned by the defendants and leased to said company, situated on South and Front streets in the city of New York. These premises had originally been leased for eight years from February 1, 1881, to Nichols & Co., who, in 1883, sublet the same to Herring & Co. and from that time until the termination of the last lease, in November, 1900, the premises were occupied by the said company, or its predecessors, under leases from the defendants, for the business of manufacturing safes. On December 23, 1897, receivers of said company were appointed who took possession of said premises, under the existing lease from defendants, together with all the property pertaining thereto, and continued in possession until the termination of the lease on November 19, 1900, the receivers being dispossessed for the nonpayment of rent. The receivers attempted to remove from the premises the property in controversy, insisting that the articles were trade fixtures which could be removed without substantial injury to the building. They were prevented from doing so by the defendants upon the ground that the articles were not trade fixtures but were essential parts of the realty. The right of action of the receivers for this alleged conversion was duly assigned to the plaintiff, the Herring-Hall-Marvin Safe Company. The jury found that the two boilers were worth $1,000, the two engines $1,200, the shafting, hangers, pulleys and appliances $1,100 and all the other items $335. Although inclined to the opinion that there could be no recovery for the boilers the trial judge directed a verdict for the full amount, $3,635, in order that the entire controversy might be finally disposed of in this court. One of the engines (the Corliss), with some of the shafting and heating apparatus was in the building when Herring & Co. purchased the plant of Nichols & Co., in 1883. The parties agreed upon the value of this engine as $850. The other engine (the Gamble), the agreed value of which is $350, was placed in the building during the existence of the last set of leases. The boilers were put in in 1894; they were new at that time and replaced the old boilers, purchased from Nichols & Co., which were worn out. They were used to run the engines and the exhaust steam was used for heating. As to the other property in question the major part was placed in the building by Herring & Co. With

the exception of the boilers, the Gamble engine, the Worthington pump and the dynamo all of the articles passed upon by the jury were placed upon the premises during the leases to Nichols & Co. of 1881 and to Herring & Co. of 1889. The leases provided that at the end of the respective terms the premises should be surrendered in good condition and none of them referred specifically to any of the articles which are the subjects of this controversy.

The principal question argued is whether there was error in the refusal of the court to direct a verdict for the defendants. The defendants insist that the articles in question were not the property of the plaintiff or its assignors, the right of removal, if it ever existed, being lost by taking new leases without any reservation permitting such removal.

The law of the state where the property is situated, when explicit and uniform, is taken as the guide in deciding what annexation to the freehold of a chattel makes it a part of the realty. In New York the rule is that if the article be attached for temporary use with the intention of removing it and in such a manner that its removal can be effected without substantial injury to the freehold it will be regarded as a chattel and may be removed by the tenant. If, on the other hand, the annexation be permanent in character or the article be specially adapted for use in the place where it is annexed it becomes a fixture and cannot be removed. N. Y. Life Ins. Co. v. Allison, 107 Fed. 179, 46 C. C. A. 229. Articles annexed to the realty for the purpose of carrying on a trade are known as "trade fixtures" and are removable by the tenant during his term if the removal will not materially injure the premises. Am. & Eng. Enc. of Law (2d Ed.) vol. 13, p. 642. It seems, therefore, that all of the articles in controversy were trade fixtures and, with the possible exception of the boilers and a part of the shafting, could be removed without injury to the building. The testimony is clearly to this effect and the court so finds. We see no reason why the boilers and shafting should be excepted. Boilers have frequently been held to be trade fixtures under similar circumstances to those disclosed by the present proof.

In Livingston v. Sulzer, 19 Hun, 375, the court, at page 380, says:

"We are at a loss to see why the ranges and boilers, and other fixtures, would not have been properly removable by an outgoing tenant who had placed them there for the purposes of trade and business."

See, also, Smith v. Whitney, 147 Mass. 479, 18 N. E. 229; Holbrook v. Chamberlin, 116 Mass. 155, 17 Am. Rep. 146; Globe Mills v. Quinn, 76 N. Y. 23, 32 Am. Rep. 259.

The same is true of the shafting, pulleys, etc. Cook v. Trans. Co., 1 Denio, 91.

We are pointed to no testimony which establishes the fact that the removal of these articles would have materially injured the freehold. The plant of the lessees was put in the building for the purpose of "manufacturing safes"; the lessors knew this and it was expressly stated in the leases. The boilers were there to generate steam for running the engines. This was their paramount use; incidentally the exhaust steam was used for heating purposes. It appeared that the

steam pipes and radiators were old and out of order and that the heating plant "had not been used latterly by Herring & Co., or Herring-Hall-Marvin Company to any great extent. It was in pretty bad order; pretty bad repair." The building was a factory where the workmen were constantly engaged in physical exercise and it certainly does not satisfactorily appear that a heating plant was a necessity in a building of this character or that the pipes and radiators were so attached to the realty as to make them fixtures. The claim for these articles was abandoned at the trial because they were found to be valueless. As originally constructed there seems to have been no heating plant provided for the building, the one in question having been put in by Nichols & Co. There is nothing to show that such a plant was essential or that the owners did not desire to have the building in a condition where it could be used for purposes where a general heating plant would not only be unnecessary but objectionable.

Regarding the shafting the proposition is advanced that a portion of it was essential to the maintenance of the building for the reason that it was used in raising and lowering a so-called elevator. The court found otherwise. There is no convincing proof that this elevator was essential to the continued use of the building and no satisfactory testimony to show what proportion of the entire shafting was necessary to operate the elevator. The defendants converted it all and now insist that a part, at least, belonged to them without showing what that is or what it was worth.

We are, therefore, convinced that all of the articles were trade fixtures which could have been removed without material injury to the building.

We are of the opinion that, in any event, the plaintiff is entitled to recover for the property placed in the building during the existence of the 1893 lease. This was the last lease made; it did not expire until 1904 and, of course, there was no abandonment of the plaintiff's title by renewal. The tenants were summarily ejected from the premises November 19, 1900. Their retirement in such circumstances cannot be regarded as a voluntary surrender of their property to the lessor; there can be no presumption of abandonment. It is hardly consistent for a landlord to turn his tenant out of doors and then assert title to the latter's chattels because he did not carry them with him. A dispossessed tenant is entitled to a reasonable time in which to remove his chattels. The receivers duly demanded possession of their property, but were not allowed to remove it; this amounted to a conversion. Lewis v. O. N. & P. Co., 125 N. Y. 341, 26 N. E. 301; Moore v. Brown, 12 Abb. Prac. 393.

As before stated the defendants contend generally that the acceptance of the new leases, without reservation as to existing fixtures, operated as an abandonment of the right of removal. This rule is clearly stated in Ewell on Fixtures, p. 174, as follows:

"It is also well settled that if a tenant having the right to remove fixtures erected by him on the demised premises accepts a new lease of such premises without reservation or mention of any claim to such fixtures, and enters upon a new term thereunder, the right of removal is lost, notwithstanding his right of possession has been continuous. In such a case the acceptance

of a new lease of the premises, including the fixtures, without any reservation of right or mention of any claim to the fixtures or occupation under the new letting, are equivalent to a surrender of possession to the landlord at the expiration of the first term."

Counsel for defendants have collected numerous authorities in support of this rule and it cannot be denied that many of them, broadly considered, sustain the defendants' contention, but we are constrained to think that the better reasoning so limits the application of the rule as not to include the present controversy.    The rule is of ancient origin and has grown up step by step, the common law accepting some of the harsh analogies of the civil law, until, as trade and commerce expanded, it was found that a harsh application of it to the new relations was producing inequitable results never contemplated at the time the rule had its origin.    The trend of recent authority is toward a restricted application of the rule to trade fixtures so as to prevent manifest injustice.    Regarding the rationale of the rule it is difficult to discover any principle of logic or equity which can be invoked in its support.    Take the case at bar.    The defendants are owners of real estate in the city of New York.    The Herring Company had installed a plant for manufacturing safes on defendants' property with their consent.    For 17 years the business was continued and the rent paid until November, 1900, when the lease terminated.    What right had the defendants to the Herring plant; what consideration did they pay; what had the Herring Company done to forfeit its rights; what principle of law or equity demanded that machinery, worth several thousand dollars, should be taken from the manufacturer and handed to the landowner?    At a time when manufacturing is well-nigh universal, when the transmission of power by steam and electricity has made it possible to use a multitude of buildings and parts of buildings for manufacturing purposes which were never so used before, a rigid application of the rule in question would produce the most inequitable results.    Assume, for example, that the lessee of a floor in one of the modern buildings concludes to go into the printing business and, with consent of the lessor, installs a plant, including Mergenthaler typesetters, Hoe presses and the like, all fastened to the building.    At the end of the term the lease is renewed in the identical language of the first lease.    If the defendants' contention be correct the moment the tenant goes into possession under the new lease the title to this exceedingly valuable property passes to his landlord.    Such a rule must yield to modern conditions and modern progress.

Our views in this regard cannot be better expressed than by quoting from Devin v. Dougherty, 27 How. Prac. 455, where the tenant, for business purposes, had built an awning over the sidewalk in front of his shop during the time of the original lease, which was renewed without reservation as to the awning.    The court said:

"As the new lease was intended merely to provide for a further occupancy of the premises, and that for the same purposes, I see not why it was necessary for the tenant to reserve in it any rights in regard to a thing which was his, and which it must have been understood he was to continue to use as

his own during his new term. He hired, for a second time, his landlord's premises; but how can that be said to be also a hiring of property, upon these premises, which belonged to himself, and which, as yet, he had a right to use upon those premises under a lease still in force? What need was there of any agreement as to what he then had a right to remove, and an equal right to continue to use upon the premises as long as he secured the right to the occupancy of such premises?"

This excerpt from the opinion of Judge Reynolds is quoted not because the decision is controlling, but because of the admirable manner in which a common-sense proposition is stripped of technicalities and presented in clear and convincing language.

The most recent decision upon the question is Bernheimer v. Adams, 70 App. Div. 114, 75 N. Y. Supp. 93, affirmed by a unanimous decision of the Court of Appeals, May 19, 1903, 175 N. Y. 472, 67 N. E. 1080. As no opinion was written in the Court of Appeals we must look to the opinion of the Appellate Division for the facts and arguments supporting their conclusions. The opinion is carefully written and substantially all of the leading cases bearing on the question involved will be found there cited. The court makes a distinction, which we think is a proper one, between fixtures which are distinctively realty, such as buildings, fences, bank vaults and the like, and chattels known as trade fixtures, which are capable of being removed without injury to the freehold. With this distinction observed no injustice can be done.

If the fixtures are appurtenant to the land, so that a deed or lease of the premises will necessarily include them, a reservation should be made if the tenant desires to retain them, but as to chattels which can be removed and carried away without injury no such exception should be necessary. There can be no presumption that a tenant intends to present his personal property to his landlord because the lease fails to give him the right to remove it. He has that right without regard to the landlord's wishes and nothing short of conduct which amounts to an estoppel and evinces a clear intention to abandon his property can deprive him of that right. The law does not favor forfeitures.

There was no reversible error in the admission of the testimony of Frank O. Herring as to the intention of the firm in placing the articles in question in the building. If the question had been confined to the intention of the witness there can be no question as to its competency, for the reason that the intention of the lessee in placing the disputed property on the premises is one of the principal elements in fixing its legal status. But even if it be assumed that the question were too broad it was immaterial, as, irrespective of the answer of the witness, there was ample testimony to sustain the finding of fact that the articles were not intended to be left on the premises permanently. The acts of the parties and the circumstances surrounding the leases and occupancy were sufficient to warrant a presumption to this effect.

We have examined the other exceptions argued and are of the opinion that they were not well taken.

The judgment is affirmed.